1  COOLEY LLP
   JOHN C. DWYER (136533) dwyerjc@cooley.com
2  JESSICA VALENZUELA SANTAMARIA (220934)
   jsantamaria@cooley.com
3  ADAM TRIGG (261498) atrigg@cooley.com
   Five Palo Alto Square
4  3000 El Camino Real
   Palo Alto, CA  94306-2155
5  Telephone:      (650) 843-5000
   Facsimile:      (650) 849-7400
6
   Attorneys for Defendants
7  XENOPORT, INC., RONALD W. BARRETT, WILLIAM J.
   RIEFLIN, DAVID A. STAMLER, and DAVID R. SAVELLO
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                 SAN JOSE DIVISION

12 | IN RE XENOPORT, INC. SECURITIES | Case No. 10-CV-3301 RMW
   | LITIGATION |
13 | | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**
14 | |
15 | |
   | | Date:       September 23, 2011
16 | | Time:       9:00 am
   | | Judge:      Hon. Ronald M. Whyte
17 | |
18 | |

19

20

21

22

23

24

25

26

27

28

**Table of Contents**

**Page**

I.      INTRODUCTION ................................................................................................. 2

II.     STATEMENT OF ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS ........ 4

        A.      Defendants ........................................................................................ 4

        B.      The FDA Drug Approval Process ........................................................ 4

        C.      The FDA Approval Of Horizant .......................................................... 5

                1.      Horizant .................................................................................... 5

                2.      Successful Completion Of Clinical Studies ............................... 6

                3.      The Allegedly False Statement .................................................. 6

        D.      FDA's Complete Response Letter ....................................................... 7

        E.      FDA's Subsequent Approval Of Horizant ............................................ 8

        F.      The Litigation .................................................................................... 9

III.    LEGAL STANDARD ........................................................................................... 9

        A.      General Standards For Motions To Dismiss ........................................ 9

        B.      Plaintiff Must Plead Falsity And Scienter With Particularity .............. 10

IV.     ARGUMENT .................................................................................................... 11

        A.      Plaintiff Fails To State A Claim For Violation Of Section 10(b) .......... 11

                1.      Plaintiff Fails To Adequately Plead That Any Defendant Acted
                        With The Requisite Scienter ..................................................... 11

                        a.      The 2008 Bonuses Actually Negate Any Inference Of
                                Scienter ......................................................................... 12

                        b.      A Holistic View Of The Record Does Not Support Scienter ........ 15

                2.      Plaintiff Fails To Adequately Allege Falsity And Materiality ................. 17

                        a.      Plaintiff Fails To Adequately Allege That The Statement
                                Describing Horizant's Preclinical Safety Profile As
                                "Similar" To Gabapentin Was False ............................... 17

                        b.      XenoPort Had Not Uncovered Any Issues It Believed
                                Would Affect the NDA .................................................... 21

                        c.      Plaintiff Also Fails To Adequately Allege The Omission Of
                                A Material Statement ..................................................... 22

                3.      Plaintiff Fails To Adequately Plead Loss Causation Because The
                        Stock Dropped Before The Alleged Corrective Disclosure ..................... 23

        B.      Plaintiff Fails To State A Claim For Violation Of Section 20 ............................ 25

        C.      The FAC Should Be Dismissed With Prejudice .................................. 25

V.      CONCLUSION ................................................................................................. 25

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

# TABLE OF AUTHORITIES

**Page**

CASES

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (U.S. 2009) ............................................................................................... 10

*In re Autodesk, Inc. Sec. Litig.,*
  132 F. Supp. 2d 833 (N.D. Cal. 2000) ............................................................................... 10

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ........................................................................................................... 22

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................................................... 10

*Brody v. Transitional Hosps. Corp.,*
  280 F.3d 997 (9th Cir. 2002) ............................................................................................. 11

*Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.,*
  Case No. 07CV1111-IEG-RBB, 2008 U.S. Dist. LEXIS 38899 (S.D. Cal. May 12,
  2008) ................................................................................................................................... 21

*In re Cutera Sec. Litig.,*
  610 F.3d 1103 (9th Cir. 2010) ...................................................................................... 21, 22

*DSAM Global Value Fund v. Altris Software, Inc.,*
  288 F.3d 385 (9th Cir. 2002) ........................................................................................ 10, 11

*In re Dura Pharms., Inc. Sec. Litig.,*
  548 F. Supp. 2d 1126 (S.D. Cal. 2008) ........................................................................ 21, 24

*Ferdik v. Bonzelet,*
  963 F.2d 1258 (9th Cir. 1992) ............................................................................................. 4

*Fort Worth Employers' Retirement Fund v. Biovail Corp.,*
  615 F. Supp. 2d 218 (S.D.N.Y. 2009) .......................................................................... *passim*

*GlenFed, Inc. Sec. Litig.,*
  *In re*  42 F.3d 1541 (9th Cir. 1994) ................................................................................... 10

*Hollinger v. Titan Capital Corp.,*
  914 F.2d 1564 (9th Cir. 1990) ........................................................................................... 25

*In re Allergan Inc. Sec. Litig.,* SACV 89-643AHS (RWR),1993 WL 623321 (C.D. Cal.
  Nov. 29, 1993) ................................................................................................................... 13

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

ii.

MASTER CAPTION
CV-10-3301 RMW

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*In re Daou Systems, Inc.*,

4
   411 F.3d 1006 (9th Cir. 2005 ................................................................................................. 24

5
*In re Downey Sec. Litig.*,
   Case No. CV 08-3261-JFW ..................................................................................................... 12

6

7
*In re LeapFrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007) ................................................................................... 24

8
*In re Metawave Commc'ns Corp. Sec. Litig.*,
   629 F. Supp. 2d 1207 (W.D. Wash. 2009) ............................................................................... 15

9

10
*In re Metricom Sec. Litig.*,
   No. C 01-4085 PJH, 2004 U.S. Dist. LEXIS 7834 (N.D. Cal. Apr. 29, 2004) ................. 12, 15

11
*In re PLC Sys., Inc. Sec. Litig.*,

12
   41 F. Supp. 2d 106 (D. Mass. 1999) ....................................................................................... 23

13
*In re Syncor Int'l Corp. Sec. Litig.*,
   239 F. App'x 318 (9th Cir. 2007) ........................................................................................... 12

14

15
*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................................................... 12

16
*Johnson v. Pozen, Inc.*,

17
   1:07CV599, 2009 U.S. Dist. LEXIS 12765 (M.D.N.C. Feb. 19, 2009) ................................. 16

18
*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
   927 F. Supp. 1297 (C.D. Cal. 1996) ........................................................................................ 11

19

20
*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................................................. 24

21
*Mohammed v. Wilson*,

22
   No. C-96-3319 EFL, 1996 U.S. Dist. LEXIS 14374 (N.D. Cal. Sept. 27, 1996) ..................... 4

23
*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996) .................................................................................................... 25

24

25
*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) .................................................................................................... 10

26
*In re Silicon Graphics, Inc. Sec. Litig.*,

27
   183 F.3d 970 (9th Cir. 1999) .................................................................................................... 11

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iii.

MASTER CAPTION
CV-10-3301 RMW

# TABLE OF AUTHORITIES
## (continued)

Page

*South Ferry LP, No. 2 v. Killinger,*
542 F.3d 776 (9th Cir. 2008) ........................................................................ 10, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
127 S. Ct. 2499 (2007) ................................................................................. 11, 17

*In re Vantive Corp. Sec. Litig.,*
283 F.3d 1079 (9th Cir. 2002) ...................................................................... 10, 25

*Wool v. Tandem Computers, Inc.,*
818 F.2d 1433 (9th Cir. 1987) ............................................................................ 25

*Zack v. Allied Waste Indus., Inc.,*
No. CIV04-1640PHXMHM, CIV04-1805PHXMHM, CIV04-2058PHXMHM,
2005 WL 3501414 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir. 2008).......... 13

*Zucco Partners, LLC v. Digimarc Corp.,*
552 F.3d 981 (9th Cir. 2009) ........................................................................ 10, 22

**STATUTES**

15 U.S.C.
§ 78u-4(b) ............................................................................................................ 1
§ 78u-4(b)(1) ..................................................................................................... 10
§ 78u-4(b)(2) ..................................................................................................... 11
§ 78u-5(c) .......................................................................................................... 21

Securities and Exchange Act
§ 10(b) ...................................................................................................... *passim*
§ 20(a) ................................................................................................................. 2
§ 21D(b) .............................................................................................................. 1

**RULES**

Federal Rules of Civil Procedure
Rule 9(b) ...................................................................................................... 1, 10
Rule 12(b)(6) ....................................................................................................... 1

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

MASTER CAPTION
CV-10-3301 RMW

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD IN THIS MATTER:**

PLEASE TAKE NOTICE that on September 23, 2011, or as soon thereafter as this motion may be heard, defendant XenoPort, Inc. ("XenoPort" or the "Company") and individual defendants Ronald W. Barrett, William J. Rieflin, David A. Stamler, and David R. Savello ("Individual Defendants" and, collectively with XenoPort, the "Defendants") will and hereby do move to dismiss with prejudice all claims asserted against them in Plaintiff's First Amended Complaint For Violation Of The Federal Securities Laws ("FAC"), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and Section 21D(b) ("PSLRA") of the Securities Exchange Act of 1934, as amended ("Exchange Act"), 15 U.S.C. § 78u-4(b).  This motion is based on the pleadings; the accompanying Memorandum of Points and Authorities; Defendants' Request for Judicial Notice; the Declaration of John C. Dwyer ("Dwyer Dec.") and exhibits ("Ex.") thereto; and other matters as may be presented in connection with the hearing on the motion.

### STATEMENT OF ISSUES TO BE DECIDED

A.      Whether Plaintiff fails to plead with particularity facts that raise a strong inference of scienter where the FAC includes no allegations regarding any Individual Defendant's state of mind, makes no reference to witness testimony or documents suggesting Defendants knew the statements were false or misleading when they were made, and alleges that Defendants misstated the likelihood of FDA approval of a drug candidate that the FDA ultimately did approve?

B.      Whether Plaintiff fails to plead with particularity that Defendants' statements relating to the comparison of two drugs were materially false or misleading at the time they were made, when the FDA agreed to the comparison and the record demonstrates the facts were not likely to affect approval of a drug, did not affect the approval, and did not affect the stock price?

C.      Whether Defendants' alleged misrepresentation regarding what they "believe will affect" their product candidate is an inactionable forward-looking statement under the PSLRA's "safe harbor" provision?

D.      Whether Plaintiff fails to adequately plead loss causation where the stock drop occurred before any alleged corrective disclosure?

E.      Whether Plaintiff fails to adequately plead that the Individual Defendants are liable

1  as control persons under Section 20(a) of the Exchange Act when Plaintiff fails to plead a

2  violation of Section 10(b) in the first instance?

3  **MEMORANDUM OF POINTS AND AUTHORITIES**

4  **I.   INTRODUCTION**

5       Plaintiff now alleges in the FAC the theory that Plaintiff articulated in Plaintiff's

6  opposition to Defendants' successful motion to dismiss the Consolidated Complaint: that

7  Defendants fraudulently represented that the preclinical safety profile of *Horizant*™ was similar

8  to the preclinical safety profile of gabapentin, the FDA-approved drug on which *Horizant* is

9  based.  However, the new allegations fail to cure the fatal pleading deficiencies the Court found

10  in the Consolidated Complaint.  Accordingly, Defendants respectfully request that the FAC be

11  dismissed with prejudice.

12       Despite the Court's admonishment regarding the lack of scienter allegations in the

13  Consolidated Complaint, Plaintiff still fails to cite to a single witness (confidential or otherwise),

14  a single contemporaneous document or a single suspicious stock sale that would tend to support

15  an inference that any Defendant acted fraudulently or with reckless disregard of the truth.  The

16  sole new allegation that Plaintiff alleges supports scienter is that the Individual Defendants were

17  motivated to fraudulently inflate XenoPort's stock price so they could qualify for larger cash

18  bonuses for 2008.  Rather than support Plaintiff's cause, this new allegation is the final nail in

19  Plaintiff's scienter coffin.  What Plaintiff fails to note in the FAC, but what is clear from the very

20  documents cited by Plaintiff, is that the 2008 bonuses, calculated on a cash basis, were paid to

21  Defendants, with their consent, in shares of XenoPort common stock of an equal value.  That is,

22  the Defendants, according to Plaintiff's nonsensical allegations, agreed to receive stock whose

23  value they had fraudulently inflated rather than cash.  Moreover, Plaintiff fails to allege that the

24  Defendants subsequently sold the shares they received in lieu of the 2008 cash bonuses, or any

25  other shares for that matter, during the period in which the value of the stock was allegedly

26  inflated.  Not only has Plaintiff failed to allege that Defendants profited from their alleged fraud,

27  Plaintiff's new allegation makes clear that Defendants suffered real economic loss.  Whether this

28  new allegation is viewed singly or together with Plaintiff's other scienter allegations regarding

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

2.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

1    efforts to attain typical corporate objectives, the **only** cogent inference to draw from the FAC is

2    that Defendants acted in good faith.

3          Plaintiff's falsity allegations fare no better.  The sole statement that Plaintiff alleges was

4    false was XenoPort's statement that described the preclinical safety profiles of *Horizant* and

5    gabapentin as similar, despite a cancer signal for female rats at exceedingly high doses of

6    *Horizant*.  Plaintiff asserts this alleged misrepresentation "made it impossible for the public to

7    gain a meaningful understanding of the drug's potential for FDA approval" for moderate-to-

8    severe primary Restless Leg Syndrome ("RLS").   (¶ 3.)[1]   Yet, Plaintiff's own allegations

9    demonstrate that the allegedly fraudulent statement was immaterial as the FAC acknowledges

10   that, in fact, **the FDA did approve *Horizant*** for the treatment of RLS.  Further, the documents

11   cited in the FAC make three things undeniably clear.  First, the FDA itself considered the

12   preclinical safety profiles of the two compounds similar, noting, in describing the preclinical data

13   relating to *Horizant*, that it "acknowledge[s] that similar [preclinical] findings were known at the

14   time of our approval of gabapentin, a closely related drug."  (Ex. L at 2.)  Second, the FDA's

15   initial refusal to approve *Horizant* had nothing to do with differences between the preclinical

16   safety profiles of *Horizant* and gabapentin, generally, or the preclinical study results related to

17   female rats, more specifically.  Rather, the FDA, though it had previously determined that the

18   safety risks associated with gabapentin were justified in light of  the indication for which it was

19   approved (refractory epilepsy), was concerned whether the seriousness of RLS warranted similar

20   risks.  And finally, the FDA ultimately approved *Horizant* for the treatment of RLS without

21   requiring any additional studies regarding *Horizant*'s tolerance by female rats.

22         The truth is that Plaintiff initiated this litigation before the FDA approved *Horizant*,

23   believing that Plaintiff had a case based on a failed drug candidate.  The FDA's approval of

24   *Horizant* undermines the very essence of the litigation and is fatal to Plaintiff's allegations that

25   Defendants intentionally overstated the prospects for approval.  For these and the other reasons

26   set forth below, Defendants request that the FAC be dismissed in its entirety and with prejudice.

27

28   _____
     [1] All paragraph references are to the FAC, unless otherwise indicated.

Cooley LLP
Attorneys At Law
Palo Alto

3.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

1    **II.     STATEMENT OF ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS**

2          **A.     Defendants**

3          XenoPort is a biopharmaceutical company headquartered in Santa Clara, California.  (¶

4    14.)  It develops product candidates that utilize the body's natural nutrient transport mechanisms

5    to improve the therapeutic benefits of existing drugs – known as "parent drugs."  (Ex. I at S-1.)  A

6    key component of XenoPort's strategy is to capitalize on the known safety, efficacy, and

7    established drug development history of the parent drugs.  (*Id.*)

8          The Individual Defendants named in the FAC are identified as Ronald W. Barrett

9    ("Barrett"), XenoPort's co-founder and Chief Executive Officer; William J. Rieflin ("Rieflin"),

10   XenoPort's President; David A. Stamler ("Stamler"), XenoPort's Chief Medical Officer; and David

11   R. Savello ("Savello"), XenoPort's Senior Vice President of Development.[2]  (¶¶ 15, 16, 17, 18.)

12         **B.     The FDA Drug Approval Process[3]**

13         Before a drug can be sold in the United States, it must be approved by the U.S. Food and

14   Drug Administration ("FDA") following an intensive regulatory review.  As part of that process,

15   the FDA requires a drug candidate's sponsor to subject the drug to rigorous scientific and clinical

16   studies to ensure both the safety of the drug for humans and the efficacy of the drug in treating the

17   condition (or "indication") for which it is intended.  Those studies fall into two broad categories.

18         The first category of studies typically required by the FDA involves testing the drug in

19   living animals.  These studies, commonly referred to as preclinical studies, involve laboratory

20   tests in which the drug is administered in animals – often rodents (rats and mice) and primates –

21   in order to demonstrate, among other things, the safety of the proposed medication and the lack of

22   toxicity at doses likely to be administered to humans.  If successful, the results of these studies are

23   used to support an application to the FDA, known as an Investigational New Drug application

24   ("IND"), which is required before the drug can be used in human trials.

25   ――――――――――
[2] Though Plaintiff named Mark A. Gallop in the Consolidated Complaint, they have not named him
26   as a defendant in the FAC.  Accordingly, the claims  against Dr. Gallop should be dismissed with
prejudice.  *See Mohammed v. Wilson*, No. C-96-3319 EFL, 1996 U.S. Dist. LEXIS 14374, at *7
27   (N.D. Cal. Sept. 27, 1996) ("Defendants not named in an amended complaint are no longer
defendants.") (*citing Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992)).
[3] This section is based on information posted on the FDA's website, as described in the Declaration
of John C. Dwyer at ¶ 23.

28

1   If the FDA approves the IND, the drug's sponsor is permitted to begin the second

2   category of studies: clinical studies with human subjects. Clinical studies typically include three

3   phases. Phase 1 involves the administration of varying doses of the drug to relatively small

4   numbers of healthy subjects and focuses on the safety and pharmacology of the compound. In

5   Phase 2, the drug is typically administered to several hundred patients suffering from the

6   condition the drug is intended to treat. The trials are designed to determine the drug's

7   effectiveness in treating the indication and to determine the effective dose and other data

8   important for the larger studies to follow. Finally, Phase 3 studies tend to involve much larger

9   numbers of patients suffering from the relevant condition and are designed to gather additional

10  data regarding the safety and efficacy of the drug and the optimum dosage for treatment.

11  Throughout this process, the FDA and the investigators conducting the trials regularly

12  communicate to ensure the safety and integrity of the process.

13  If the sponsor successfully completes the clinical trials, it submits a New Drug

14  Application ("NDA") to the FDA seeking approval to manufacture and sell the drug in the United

15  States. The NDA includes, among many other things, all the preclinical and clinical information

16  obtained during the testing phase. The FDA may deny approval, grant approval or request that

17  additional studies be conducted (either prior to final approval or post-approval).

18      **C.      The FDA Approval Of *Horizant***

19          **1.     *Horizant***

20  *Horizant* (also known as XP13512, 512, gabapentin enacarbil, or Solzira) is the drug at the

21  center of Plaintiff's allegations. During the class period, XenoPort was actively developing

22  *Horizant* for the treatment of moderate-to-severe primary restless legs syndrome ("RLS"). (¶ 2.)

23  XenoPort created the drug by chemically modifying its parent drug, gabapentin, to improve the

24  manner in which it is absorbed into the body. (Ex. N at 3.) Gabapentin is approved by the FDA

25  for the treatment of refractory epilepsy and post-herpetic neuralgia and has been sold by Pfizer

26  Inc., under the trade name Neurontin, since 1993. It is currently sold as a generic drug by a

27  number of companies. (Ex. I at S-1.)

28  In January 2005, after extensive preclinical studies, the FDA cleared the *Horizant* IND,

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

5.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

thus allowing XenoPort to initiate clinical trials.

### 2.  Successful Completion Of Clinical Studies

On February 28, 2008, XenoPort announced the successful results of the third and final Phase 3 study of *Horizant* for the treatment of RLS and that it looked forward to filing an NDA for the drug.   (Ex. T.)   (The company had issued numerous updates regarding the clinical development of *Horizant* between 2005 and this date.)

### 3.  The Allegedly False Statement

On May 7, 2008, XenoPort held its quarterly conference call with analysts.  During the call, an analyst asked the Company to provide "a summary of the long-term tox studies of gabapentin … and also an update potentially on your long-term tox studies for the [*Horizant*] compound."  Dr. Ron Barrett, XenoPort's CEO and one of the individually named defendants in this action, began his response by describing the preclinical studies of gabapentin:

> With regard to gabapentin, this is a molecule that has a remarkable preclinical safety profile. Doses in the studies with gabapentin went up to 2 grams per day in rodents and also a very high level in the monkey studies, and really the only chronic toxicology finding that was in those studies was hyaline droplet formation in the kidneys that led to kidney damage. And that's a known effect of molecules in the chemical structure class of gabapentin, where the drug binds the alpha-2-microglobulin and forms these droplets in the kidneys. That is a male Wistar rate [sic] phenomenon. It doesn't occur in other species and has been deemed to be not relevant to human toxicology.

> In terms of carcinogenicity, the one finding in the gabapentin studies was pancreatic acinar cell tumors in male Wistar rates [sic] at the highest dose. And, again, the work was done to get the FDA comfortable that this did not represent a significant risk to humans. It was found only in rats, only in male rats, and not in other -- in mice.

(Ex. C at 6-7.)  Dr. Barrett then turned to the preclinical findings regarding *Horizant*:

> With regard to our package [for *Horizant*], we've done a full clinical or preclinical safety package that included long-term tox as well as two-year carcinogenicity studies in two species. And what we've indicated is that the safety profile [of *Horizant*] is very similar if not identical to gabapentin, that we have not uncovered any issues that we believe will affect the NDA timing nor the probability of successful NDA approval from the preclinical tox side.

(*Id.* at 7.)

This latter statement is the only affirmative misrepresentation alleged by Plaintiff and, accordingly, the purported class period begins on this date.  According to Plaintiff, the statement

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

6.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

was false because tumors were detected in female rats in one of the *Horizant* preclinical studies at an extremely high dosage.  (¶ 28.)

On January 9, 2009, GlaxoSmithKline ("GSK"), XenoPort's distribution partner for *Horizant*, filed the NDA for *Horizant* with the FDA.  (¶ 32.)

### D.    FDA's Complete Response Letter

On February 17, 2010, the FDA issued a Complete Response Letter ("CRL"), stating that it would not approve *Horizant* for RLS at that time.  (¶ 5.)  Though the FDA acknowledged "substantial evidence of effectiveness for *Horizant* (gabapentin enacarbil) as a treatment for patients with moderate to severe RLS," and acknowledged that it had "not identified a clinical safety concern that would prevent approval," it determined that "the signal for pancreatic acinar cell tumors (adenoma, carcinoma) in the rat is of sufficient concern to preclude approval at this time."  (Ex. L at 2.)  While it mentioned the findings for female rats, the FDA made clear that its concern centered on the preclinical findings in male rats:

> Our view is that the 8-fold [safety] margin for the 600 mg daily dose[4], based on the finding of pancreatic carcinoma in the male rat, is unacceptably low.

(*Id.*)

Further, the FDA stated that similar preclinical findings were observed for gabapentin but that it was not sure whether the risks reflected in those findings were warranted for the treatment of RLS (as opposed to epilepsy):

> **We acknowledge that similar findings were known at the time of our approval of gabapentin, a closely related drug, for the treatment of refractory epilepsy.** We believed at the time, and continue to believe, that the seriousness and severity of refractory epilepsy, and the benefit afforded these patients, justified the potential risk of pancreatic cancer. Although patients with RLS have very significant symptoms, it is our view that the seriousness of the condition is not sufficient to justify this risk.

(Ex. L at 2 (emphasis added).)

Finally, the FDA stated that it was "open to arguments that this concern should not

---

[4] To determine if rat tumors are potentially relevant to human safety, the FDA looks at the margin between the exposure of the drug in the bloodstream of rats at the highest dose that does not show an increase in tumors (the "no-effect dose") and the exposure in humans at the maximum recommended daily dose.  This is known as the "safety margin."  (Ex. O at 17.)

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

1    prevent approval of" *Horizant*.  (*Id.* at 3.)

2          During conference calls with analysts during the days following receipt of the CRL, Dr.

3    Barrett expressed disappointment and surprise by the FDA's decision, noting that the FDA had

4    never expressed concern regarding the preclinical studies prior to the issuance of the CRL.  (Ex. E

5    at 2, 4.)  He also noted that, while federal law generally requires all new drugs to be reviewed by an

6    FDA Advisory Committee unless the FDA determines it is not necessary, the FDA had informed

7    XenoPort several months earlier that no Advisory Committee was necessary for *Horizant*.  (Ex. F at

8    13.)  Finally, Dr. Barrett indicated that XenoPort and GlaxoSmithKline intended to discuss with the

9    FDA its concerns before deciding what the next steps would be.  (*Id.* at 3.)

10         XenoPort's stock price dropped sharply shortly after the press release issued by the Company

11   regarding the CRL.  The purported class period ends on February 17, 2010, the date of the CRL.

12         **E.      FDA's Subsequent Approval Of *Horizant***

13         In October 2010, XenoPort and GSK, after consultation with the FDA, resubmitted the

14   NDA for *Horizant* to the FDA.  The resubmission contained a number of arguments as to why the

15   FDA's concerns were unfounded, references to extensive scientific literature regarding

16   gabapentin, and the results of additional toxicology studies involving gabapentin in male rats.

17   (*See* Ex. O at 2-3 (citing additional materials submitted by XenoPort).)  The additional materials

18   included in the NDA resubmission did not include any additional studies involving female rats.

19         On April 6, 2011, the FDA approved *Horizant* for moderate-to severe RLS.  (¶¶ 28, 53,

20   Ex. M.)  The FDA subsequently released internal memoranda related to its review of XenoPort's

21   submission, which are referenced by Plaintiff in the FAC.  In a "Summary Review" dated the

22   day before final approval by the FDA, Dr. Ellis Unger, Deputy Director of the Office of Drug

23   Evaluation, reviewed the additional data submitted and concluded that the FDA's original

24   concern regarding the 8-fold safety margin for *Horizant* based on findings in male rats had been

25   assuaged:

26         The sponsor provided toxicokinetic bridging data obtained under conditions
             similar to those used in the original gabapentin rat carcinogenicity study, at doses
27           of 1000 and 2000 mg/kg/day.  The gabapentin exposure (AUC) in the rat at the
             NOAEL [No-Observed Adverse Effect Level, *i.e.*, the no-effect dose] (1000
28           mg/kg) was approximately 25-times higher than the human exposure from

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

8.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

[*Horizant*] at the to-be-labeled maximum recommended daily dose of 600 mg.

This safety margin of ~25 is considerably higher than the previous margin of 8 [for male rats], which was based on a NOAEL of 500 mg/kg/day for [*Horizant*] in the rat study. Although there is no clear guidance on an acceptable safety margin for carcinogenicity, the pharmacology/toxicology review team opined that a 25-fold margin between plasma exposure at the high dose used in a lifetime rat carcinogenicity study and that in humans at the maximum recommended daily dose suggests lesser concern for humans.

(Ex. N at 5; *see also* Ex. O at 17.) The Summary Review also noted that the Division of Epidemiology did not believe that further carcinogenicity studies of *Horizant* were necessary following approval. (Ex. N at 6.) Based on this analysis, the FDA approved *Horizant*.

F. **The Litigation**

Shortly after its receipt of the Complete Response Letter, several class action complaints were filed against XenoPort alleging violations of the federal securities laws. In January 2011, three months before the FDA approved *Horizant*, Plaintiff filed a Consolidated Complaint alleging that XenoPort never disclosed to investors that the *Horizant* carcinogenicity studies yielded an increased incidence of pancreatic tumors in rats. (Dkt. 20, at ¶ 54.) The claim was fatally deficient given that XenoPort had, in fact, publicly disclosed that information in May 2008. (*See* Ex. C at 6-7.) The Court dismissed the Consolidated Complaint with leave to amend for failure to allege scienter, among other deficiencies. (Dkt. 42 at 22:18-23:7.)

On June 14, 2011, Plaintiff filed the FAC. Conceding that Defendants actually disclosed information about the carcinogenicity studies, contrary to their allegations in the first complaint, Plaintiff now claims that the statements made in XenoPort's May 2008 conference call were false because *Horizant*'s safety profile was not similar to gabapentin's. (¶¶ 27-31.) To accommodate this new theory, the FAC has expanded the purported class period by moving forward the beginning of the class period from March 16, 2009 to May 7, 2008.

III. **LEGAL STANDARD**

A. **General Standards For Motions To Dismiss**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint as a matter of law where a plaintiff fails to state a claim upon which relief can be granted. To adequately state a claim "requires more than labels and conclusions, and a formulaic recitation of the elements

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

9.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

1   of a cause of action will not do . . . .  Factual allegations must be enough to raise a right to relief

2   above the speculative level . . . ."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "'Naked

3   assertions' devoid of 'further factual enhancement'" will not suffice.  *Ashcroft v. Iqbal*, 129 S. Ct.

4   1937, 1949 (U.S. 2009) (quoting *Twombly*, 550 U.S. at 557).  In deciding a motion to dismiss, the

5   Court need not accept legal conclusions asserted as "facts."  *Id.* at 1949-50.  Further, the Court may

6   consider materials incorporated into the complaint by reference and other matters subject to judicial

7   notice.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

8              **B.      Plaintiff Must Plead Falsity And Scienter With Particularity**

9              To state a claim under Section 10(b) of the Exchange Act, a plaintiff must meet an even

10  higher pleading standard.  A plaintiff must allege: (1) a misstatement or omission (2) of material

11  fact (3) made with scienter (4) on which plaintiff relied (5) which proximately caused plaintiff's

12  injury.  *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002).

13             As a claim under Section 10(b) sounds in fraud, Rule 9(b) requires plaintiffs to "state with

14  particularity the circumstances constituting fraud or mistake," including "specific facts regarding

15  the alleged fraudulent activity, such as the time, date, places, content of each fraudulent

16  representation, the reasons that the representation is false, and the identity of the person or persons

17  engaged in the fraud."  *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 839 (N.D. Cal. 2000).

18             The PSLRA imposes even more stringent requirements for pleading falsity and scienter

19  and requires plaintiffs to provide a "high level of detail."  *South Ferry LP, No. 2 v. Killinger*, 542

20  F.3d 776, 784 (9th Cir. 2008).  For falsity, a plaintiff must identify with particularity (1) each

21  statement alleged to have been misleading, (2) the reason or reasons why the statement is

22  misleading, and (3) if an allegation regarding the statement or omission is made on information

23  and belief, all facts on which that belief is formed.  *See* 15 U.S.C. § 78u-4(b)(1); *In re Vantive

24  Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002), *abrogated on other grounds in South

25  Ferry LP*, 542 F.3d 776.  It must be clear from the complaint what statements plaintiffs allege

26  were false and why they were false.  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).

27  Plaintiffs must also explain why the disputed statement was untrue or misleading when made.  *In

28  re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994), *superseded by statute on other*

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

10.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

1   *grounds as stated in Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297 (C.D.

2   Cal. 1996). If a plaintiff alleges an omission of material fact rather than an affirmative

3   misrepresentation, the "omission must be misleading; . . . it must affirmatively create an

4   impression of a state of affairs that differs in a material way from the one that actually exists."

5   *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

6         To plead scienter, a complaint must "state with particularity facts giving rise to a strong

7   inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The

8   complaint must demonstrate that each defendant acted with the "nefarious mental state necessary

9   to constitute securities fraud." *DSAM Global Value Fund*, 288 F.3d at 391. In the Ninth Circuit,

10  a plaintiff must allege "particular facts giving rise to a strong inference" of "deliberate

11  recklessness" or "conscious misconduct." *South Ferry LP*, 542 F.3d at 782 (internal quotations

12  and citations omitted). To establish "deliberate recklessness" or "conscious misconduct," a

13  plaintiff "must state facts that come closer to demonstrating intent, as opposed to mere motive

14  and opportunity." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999),

15  *abrogated on other grounds in South Ferry LP*, 542 F.3d 776. Moreover, a complaint will survive

16  a motion to dismiss only "if a reasonable person would deem the inference of scienter cogent and

17  at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,*

18  *Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007).

19  **IV.   ARGUMENT**

20      **A.   Plaintiff Fails To State A Claim For Violation Of Section 10(b)**

21          **1.   Plaintiff Fails To Adequately Plead That Any Defendant Acted With
        The Requisite Scienter**

22

23        In dismissing the Consolidated Complaint, the Court directed Plaintiff to file an amended

24  complaint with "factual allegations showing a basis for scienter." (Dkt. 42 at 22:20-22.) Plaintiff

25  fails to comply with this directive. Like the Consolidated Complaint before it, the FAC is devoid

26  of any facts supporting an inference that any Defendant acted with the "nefarious mental state

27  necessary to constitute securities fraud." *DSAM Global Value Fund*, 288 F.3d at 391. In fact, the

28  only cogent inference to be drawn from the allegations in the FAC is that the Defendants acted in

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

11.

**DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW**

1  good faith and without any intent to deceive XenoPort's shareholders.  Accordingly, the FAC

2  should be dismissed.

3          **a.      The 2008 Bonuses Actually Negate Any Inference Of Scienter**

4          In attempting to allege scienter, Plaintiff relies heavily on the only new scienter allegation

5  contained in the FAC: that Defendants were motivated to commit fraud to enhance their 2008

6  bonuses.  (¶¶ 42-48.)  According to the FAC, "The Individual Defendants' *scienter* is based on

7  artificially inflating the Company's stock during the Class Period, thereby assuring completion of

8  the secondary offering at $19 per share and, as a result, in part, of that offering, increasing their

9  annual compensation under XenoPort's corporate bonus plan."  (¶ 42.)  Upon closer inspection,

10  these new allegations not only fail to support an inference of scienter, they actually assure that the

11  only cogent inference that may be drawn is that the Defendants did not act with a fraudulent intent.

12          As a general matter, it is well established that corporate "bonuses are common and have

13  limited probative value as to scienter."  *In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 321

14  (9th Cir. 2007);  *In re Downey Sec. Litig.*, Case No. CV 08-3261-JFW (RZx), 2009 U.S. Dist.

15  LEXIS 83443, at *41-42 (C.D. Cal. Aug. 21, 2009) (holding bonuses did not support scienter

16  where complaint made no comparison to prior bonuses and company's performance was only one

17  of three factors considered in determining executive bonuses).  Like other standard corporate

18  practices (including the raising of capital), bonuses are a regular part of corporate life and do not

19  support an inference of wrongdoing.  *See, e.g., In re Metricom Sec. Litig.*, No. C 01-4085 PJH,

20  2004 U.S. Dist. LEXIS 7834, at *110 (N.D. Cal. Apr. 29, 2004) ("generic motive[s] held by all

21  companies" are "insufficient to establish scienter.");  *see also In re Wet Seal, Inc. Sec. Litig.*, 518

22  F. Supp. 2d 1148, 1176-77 (C.D. Cal. 2007) (finding allegations of bonuses "inadequate because

23  they rely on implausible inferences").

24          Furthermore, in this case, the allegations regarding the unique facts of XenoPort's 2008

25  corporate bonuses are far more consistent with an inference of good faith than an inference of

26  fraud.    Plaintiff alleges that the Individual Defendants were motivated to inflate the value of

27  XenoPort stock by concealing allegedly negative information about *Horizant*, thereby inflating

28  the price for a secondary public offering in July 2009, which would in turn qualify them for larger

Cooley LLP
Attorneys At Law
Palo Alto

12.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

bonuses for 2008.[5]  (¶¶ 42-48.)  While the FAC quotes extensively from XenoPort's 2009 proxy statement describing the 2008 bonuses (¶¶ 43-44), the FAC conveniently omits the portion of the proxy describing the fact that the bonuses were granted in the form of stock rather than cash:

> [I]n light of the current economic environment and consistent with the company's efforts to preserve cash, the board also approved, upon the recommendation of the compensation committee, and **the company's executives agreed**, that such bonus awards under the Corporate Bonus Plan for the 2008 performance period would be **paid in restricted stock units pursuant to the company's 2005 Equity Incentive Plan and not in cash**. The restricted stock units granted in lieu of cash bonus payments were immediately vested, settled in stock and granted at $26.97 per share….

(Ex. G at 27 (emphasis added).)  So, the bonuses were calculated on a cash basis and then awarded in shares of XenoPort stock of an equal value.  Thus, the Defendants agreed to forgo cash payments and instead receive their bonuses in shares of XenoPort stock whose value they had allegedly artificially inflated.   The Defendants made what were tantamount to stock *purchases*, which negate an inference of scienter.  *See Zack v. Allied Waste Indus., Inc.*, No. CIV04-1640PHXMHM, CIV04-1805PHXMHM, CIV04-2058PHXMHM, 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir. 2008) (purchases during class period are "not actions demonstrating an intent to commit fraud, and instead gives rise to an inference of good faith"); *In re Allergan Inc. Sec. Litig.*, SACV 89-643AHS (RWR),1993 WL 623321, at *23 (C.D. Cal. Nov. 29, 1993) (investments during class period rendered plaintiff's fraud claims implausible).  Further, Plaintiff fails to allege that any of the Individual Defendants sold any of the stock they received in lieu of the 2008 cash bonuses during the Class Period.  As a result, Defendants suffered the same economic loss when the stock price dropped at the end of the Class Period as did other investors.

A closer look at the allegations directed specifically to Dr. Barrett's bonus will help demonstrate the point.  According to the FAC, he was entitled to a bonus for 2008 equal to 88 percent of the maximum bonus available to him under the Company's corporate bonus plan.  (¶ 44.)  That amounted to a total bonus of $266,250.  (*Id*.)  However, as a result of the Company's

---

[5] The FAC does not allege that Dr. Stamler received any bonuses, leaving the FAC without any scienter allegations as to Dr. Stamler at all.

Cooley LLP
Attorneys At Law
Palo Alto

1    efforts to save cash, the Compensation Committee of the XenoPort Board of Directors asked Dr.

2    Barrett to accept stock rather than cash; Dr. Barrett agreed.  As a result, in lieu of cash, the

3    Company granted Dr. Barrett 9,872 shares at the then price of $26.97 per share.  Given that the

4    FAC does not allege Dr. Barrett sold those shares, one can infer that he continued to hold them

5    until the end of the Class Period when XenoPort stock closed at $6.67 per share on February 18,

6    2010.[6]  On that date, the value of those bonus shares fell to $65,846, a loss of over $200,000.

7         These facts simply are irreconcilable with any inference of scienter.  If Dr. Barrett and the

8    other Individual Defendants were committing fraud, why would they agree to receive their

9    bonuses in stock whose value they had allegedly inflated?  If they had no choice but to accept

10   stock, why would they not have immediately sold it?  The only cogent inference anyone could

11   draw from these facts is that Dr. Barrett and the other Individual Defendants who received

12   bonuses agreed to take them in stock rather than cash, thus increasing their exposure to any

13   inflation in the Company's stock price, because they believed that the case for FDA approval of

14   *Horizant* was strong, just as they had publicly stated.

15        The absurdity of Plaintiff's scienter arguments based on these bonus allegations is further

16   demonstrated by two additional facts.  First, according to the FAC, Defendants maximized their

17   2008 bonuses by ensuring a successful secondary offering in 2009 through the artificial inflation of

18   XenoPort's stock price.  (¶¶ 8, 42, 45, 47.)  But, according to Plaintiff's own allegations, the

19   secondary offering occurred in July 2009, seven months **after** the bonus awards were made and

20   three months **after** the public filing of the proxy statement cited in the FAC was filed with the SEC.

21   (¶¶ 8, 43.)[7]  Plaintiff's theory is temporally impossible.  Second, concealing negative information in

22   the hope that the stock price will rise, leading to larger bonuses, is a remarkably inefficient and

23   uncertain way to benefit oneself.  If the Individual Defendants' goal was to conceal negative

24   information to personally profit, they could have easily sold their stock at the allegedly inflated

---

25   [6] Between the bonus award and the end of the Class Period, XenoPort's closing stock price exceeded $26.97 only nine out of 274 total trading days during that period.  (Dwyer Dec., ¶ 22; Ex. U.)

26   [7] XenoPort's proxy statement states that part of Dr. Barrett's 2008 bonus was based on the completion of a "registered direct financing" (¶ 44), but this was not the July 2009 secondary

27   offering to which Plaintiff alludes.  The registered direct financing was a direct sale to institutional investors that took place in late 2008.  (Ex. G at 17.)  The FAC contains no allegations regarding

28   the direct financing or how it possibly supports scienter.

1  prices, thereby guaranteeing an economic benefit. Yet, Plaintiff makes no allegations that any

2  Individual Defendants made suspicious stock sales during the entire two-year class period.

3  **b.  A Holistic View Of The Record Does Not Support Scienter**

4  Plaintiff's scienter allegations fare no better when viewed together. Plaintiff does not

5  identify a single witness – confidential or otherwise – who supports an inference that Defendants

6  acted with any wrongful intent. Plaintiff does not identify a single contemporaneous document

7  from the Class Period that supports scienter. And Plaintiff fails to allege that any of the

8  Individual Defendants engaged in any suspicious stock sales designed to enrich themselves

9  through inflated stock prices. The one particularized allegation contained in the FAC (other than

10  the bonus allegations addressed above) relates to XenoPort's secondary stock offering in July

11  2009. (¶¶ 8, 20, 34, 42, 47.) However, such generic allegations regarding typical business

12  objectives are routinely rejected by the courts in the Ninth Circuit. *See, e.g., Metricom*, 2004 U.S.

13  Dist. LEXIS 7834, at *110 ("[T]he desire to raise capital is a generic motive held by all

14  companies, and is therefore insufficient to establish scienter."); *In re Metawave Commc'ns Corp.*

15  *Sec. Litig.*, 629 F. Supp. 2d 1207, 1218 (W.D. Wash. 2009) ("[T]he motive of raising capital is

16  too generic to establish scienter . . . ."). In short, Plaintiff fails to allege any facts that would

17  support a cogent inference of scienter.

18  Moreover, the allegations contained in the FAC and the noticeable facts are far more

19  consistent with the inference that Defendants acted in good faith than with any of the nefarious

20  inferences urged by Plaintiff. In this regard, the court's analysis in *Fort Worth Employers'*

21  *Retirement Fund v. Biovail Corp.*, 615 F. Supp. 2d 218 (S.D.N.Y. 2009), is instructive. In that

22  case, the FDA initially rejected Biovail's NDA because the defendant's clinical trials were

23  conducted as "multiple-dose" studies, and not as "single-dose" studies. *Id.* at 227-28. In

24  response, Biovail resubmitted its application to the FDA without conducting a single-dose study,

25  instead insisting that the multiple-dose study was sufficient. *Id.* at 228. The FDA approved the

26  drug based on the resubmission. *Id.* The court dismissed the plaintiff's complaint, which alleged

27  Biovail fraudulently concealed the multiple-dose risk, holding that the plaintiff had failed to

28  adequately allege scienter. In reaching that conclusion, the court emphasized that there were no

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

15.

**DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW**

1   allegations that the FDA had expressed concern during the clinical development of the drug

2   regarding the use of multiple-dose studies as opposed to single dose studies, FDA guidance

3   allowed for the use of multiple-dose studies, and the FDA ultimately approved the drug without

4   requiring a single-dose study.  *Id.*

5   　　　　The allegations in this case are remarkably similar.  First, the FAC contains no allegations

6   that the FDA ever expressed concern regarding the preclinical rat studies to XenoPort or any of

7   the Individual Defendants either at the time of the IND or any other time before it issued the

8   CRL.  Second, FDA guidance regarding safety margins suggests that the safety margin for female

9   rats in the *Horizant* studies would not be of concern to the government.  According to the FDA,

10   "if a drug is only positive in rodents at doses above those producing a 25-fold exposure over

11   exposure in humans, such a finding would not be considered likely to reflect a relevant risk to

12   humans." (Ex. R at n.11.)  Also according to the FDA, the carcinogenicity results for *Horizant* in

13   female rats produced a 28-fold safety margin.  (Ex. L at 2.)  *See Johnson v. Pozen, Inc.*,

14   1:07CV599, 2009 U.S. Dist. LEXIS 12765, at \*14 (M.D.N.C. Feb. 19, 2009) (finding no scienter

15   where defendants failed to disclose test results because FDA guidelines indicated drug could be

16   approved despite the results).  Third, the FDA ultimately approved *Horizant* just as it approved

17   the drug at issue in the *Biovail* case.  *See Biovail*, 615 F. Supp. 2d at 228 (finding that "the last

18   nail in the coffin for plaintiff's theory of scienter" was FDA's approval of defendant's

19   resubmission of its rejected application).  And finally, in approving *Horizant* after the

20   resubmission of the NDA, the FDA did not require any additional studies regarding female rats.

21   Of course, the facts here are even less suggestive of scienter than those in *Biovail* for one

22   compelling, and ultimately determinative reason: in *Biovail*, the FDA did in fact initially delay

23   approval of the drug based on the lack of a single-dose study, whereas the FDA's delay in

24   approving *Horizant* had nothing to do with female rat carcinogenicity.  (*See* section 2 below.)

25   　　　　The facts as alleged by Plaintiff and subject to judicial notice are far more consistent with

26   an inference that the Defendants acted without any intent to defraud XenoPort's shareholders.

27   Perhaps most tellingly, (1) the FDA approved *Horizant*, despite an initial delay, based on its

28   conclusion that the safety profile for *Horizant* developed during the preclinical studies warranted

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

16.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

1   approval just as the Defendants had believed; and (2) the Individual Defendants, by agreeing to

2   accept their 2008 bonuses in the form of stock rather than cash, demonstrated a belief in and a

3   commitment to the future of XenoPort and *Horizant*. These two facts, combined with the other

4   allegations described above, simply cannot be reconciled with a cogent inference of scienter.

5   *Tellabs*, 127 S. Ct. at 2510.

### 2.   Plaintiff Fails To Adequately Allege Falsity And Materiality

#### a.   Plaintiff Fails To Adequately Allege That The Statement Describing *Horizant*'s Preclinical Safety Profile As "Similar" To Gabapentin Was False

9   Plaintiff identifies a single statement that allegedly constitutes an affirmative

10   misrepresentation: Dr. Barrett's statement on May 7, 2008 regarding the preclinical studies of

11   *Horizant*.[8]  (¶ 27.)  As set forth above, the challenged statement was made by Dr. Barrett in

12   response to a question regarding the preclinical study results of gabapentin and *Horizant*.  After

13   describing the preclinical studies of gabapentin, Dr. Barrett stated:

> With regard to our package [*Horizant*], we've done a full clinical or preclinical
> safety package that included long-term tox as well as two-year carcinogenicity
> studies in two species. And what we've indicated is that ***the safety profile is very
> similar if not identical to gabapentin***, that we have not uncovered any issues that
> we believe will affect the NDA timing nor the probability of successful NDA
> approval from the pre-clinical tox side.

18   (*Id.*)  Plaintiff alleges this statement was false primarily because the *Horizant* carcinogenicity

19   studies showed tumors in a few female rats at doses far exceeding those ever tested in the

20   gabapentin study. (¶ 27.)  While Plaintiff may have successfully established that the preclinical

21   results of the two compounds were not identical, Plaintiff has failed to adequately allege that the

22   results were not "very similar" as Dr. Barrett stated.   There are three fundamental flaws in

23   Plaintiff's pleading.

24   First, it is undisputed that the FDA, after reviewing the entirety of XenoPort's NDA filing,

25   agreed that the preclinical studies for gabapentin and *Horizant* had similar results.  In the CRL,

26   the FDA was clear: "We acknowledge that similar findings were known at the time of our

---

[8] Plaintiff highlights several different phrases of the May 2008 conference call, but it is unclear how the other highlighted phrases are alleged to have been false.  (¶ 27.)

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

17.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

approval of gabapentin….” (Ex. L at 2.) The fact that Plaintiff asserts this alleged misrepresentation was material because it made it “impossible [] to gain a meaningful understanding of the drug’s potential for FDA approval” (¶ 3) only further undermines Plaintiff’s theory. It was the FDA itself, the entity ultimately responsible for determining whether the drug would be approved, that concluded the safety profiles were similar. Indeed, the FDA made clear in the CRL that its concerns were not caused by any differences in the results of the preclinical studies of the two compounds but rather were caused by the similarities of those results:

> We acknowledge that similar findings were known at the time of our approval of gabapentin, a closely related drug, for the treatment of refractory epilepsy. We believed at the time, and continue to believe, that the seriousness and severity of refractory epilepsy, and the benefit afforded these patients, justified the potential risk of pancreatic cancer. Although patients with RLS have very significant symptoms, it is our view that the seriousness of the condition is not sufficient to justify this risk.

(Ex. L at 2.) In February 2010, the FDA was not convinced that the potential risks associated with gabapentin and *Horizant* justified the use of *Horizant* to treat RLS, though it had earlier concluded that these potential risks were justified for the treatment of epilepsy. This was not because the FDA perceived different risks (they did not) but because it perceived different benefits (the treatment of refractory epilepsy versus the treatment of RLS).

Second, any differences between the preclinical findings for the two compounds was, beyond any reasonable dispute, immaterial. Plaintiff’s purported concern relates to the approvability of *Horizant*, but the FDA did approve the drug. *Biovail*, 615 F. Supp. 2d at 232 (“Plaintiff’s own allegations demonstrate that the allegedly omitted information was immaterial, because it acknowledges that the FDA ultimately approved [the drug at issue] without requiring submission of a single-dose study.”)

Furthermore, the FDA’s stated reason for the issuance of the CRL and the resulting delay in approval had nothing to do with the results relating to female rats or any other differences in the preclinical safety profiles of the two compounds. As discussed above, the FDA’s concern was whether the risks associated with *Horizant*, which it acknowledged were similar to the risks associated with gabapentin, were warranted for the treatment of RLS. More specifically, the FDA stated at that time, “Our view is that the 8-fold margin for the 600 mg daily dose, based on the

Cooley LLP
Attorneys At Law
Palo Alto

18.

Defendants’ Notice of Motion and Motion
to Dismiss First Amended Complaint
CV-10-3301 RMW

1    finding of pancreatic carcinoma in the **male** rat, is unacceptably low." (Ex. L at 2 (emphasis

2    added).) That 8-fold safety margin (which the FDA later re-calculated as approximately a 25-fold

3    safety margin after the resubmission) was actually higher than the 6.5-fold safety margin the FDA

4    found acceptable when it approved gabapentin for the treatment of epilepsy. (Ex. N at 3.)

5    However, given the FDA's concern that the severity of RLS may not warrant such risks, it

6    nevertheless issued the CRL, thus delaying ultimate approval. Finally, the internal FDA

7    memoranda cited by Plaintiff, though they note some of the differences alleged in the FAC,

8    clearly reflect that the FDA's analysis was focused on the safety margin of *Horizant* based on the

9    incidence of tumors in male, not female, rats. (Ex. N at 3; Ex. O at 3, 5, 16-17.)

10        Third, Plaintiff's allegations seem to misconstrue Dr. Barrett's statement that *Horizant*'s

11   safety profile was similar to gabapentin as being limited to a single rat study or as meaning that

12   *Horizant*'s carcinogenicity studies showed tumors only in male rats. (¶¶ 3, 33, 58.) Dr. Barrett

13   made no such statements. Rather, in the challenged statement, Dr. Barrett referred to *Horizant*'s

14   "full clinical or preclinical safety package that included long-term tox as well as two-year

15   carcinogenicity studies in two species" and compared that entire "safety package" to

16   gabapentin's. (¶ 27.) The FAC is devoid of any allegations regarding the other aspects of the

17   safety packages of the two drugs that would allow a meaningful comparison between the two.

18   The FAC falls short of the pleading requirements of the PSLRA as a result of that failure alone.

19        However, even if Dr. Barrett's statement is limited to the rat studies showing the

20   development of pancreatic cancers following administration of gabapentin and *Horizant*, the

21   statement is still not false. Merriam-Webster's Dictionary defines "similar" as "having

22   characteristics in common."[9] To describe studies as similar does not suggest that they are

23   identical or, said another way, that there are no differences between the two. As discussed above,

24   the rat studies for both gabapentin and *Horizant* resulted in the development of pancreatic acinar

25   tumors in male Wistar rats at high doses. But there were differences as well, almost all of which

26   the FAC ignores. For example, the highest dose in the *Horizant* studies (5,000 mg/kg/day)

27   resulted in three times the gabapentin exposure of the highest dose used in the historical

28   _____

[9] Definition available at http://www.merriam-webster.com/dictionary/similar.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

19.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

gabapentin studies (2,000 mg/kg/day).  (Ex. O at Table 17.)  In fact, no female rat developed

tumors in the *Horizant* study except at the highest dose.  (Ex. N at 3.)  No rats – male or female –

received gabapentin at doses even one-half that level.  Thus, while no female rats developed

tumors in the gabapentin studies, there was no way to validly compare the results.  However,

doses of *Horizant* and gabapentin at similar exposures produced similar results – no tumors in

female rats.  Another difference related to the development of tumors in male rats.  In the

*Horizant* study, fewer male rats actually developed tumors than male rats in the gabapentin

studies at similar exposure levels.  (Exs. O at 10; N at 3.)  In fact, only eight percent of male rats

in the *Horizant* study developed tumors at the 2,000 mg dose (5 of 60), while 48 percent of male

rats in the gabapentin study (24 of 50) did so.  (*Id.*)  A third difference relates to the calculated

safety margins from the studies.  As discussed above, based on the historical gabapentin study,

the FDA-calculated safety margin for gabapentin was 6.5 times.  (Ex. N at 3.)  In comparison, as

stated in the CRL, the FDA initially calculated for male rats an 8-fold safety margin for *Horizant*

based on the *Horizant* rat studies, suggesting that *Horizant* for RLS was at least as safe, if not

safer, than gabapentin was for epilepsy.  (Ex. L at 2.) (At that time, the FDA calculated the safety

margin of *Horizant* for female rats as at least 28 times.)   After considering the additional

materials submitted by XenoPort as part of the resubmission of the NDA, the FDA calculated the

safety margin of *Horizant* for male rats at approximately 25 times.[10]  (Exs. O at 17; N at 5.)[11] As

discussed above, the FDA concurred in Dr. Barrett's assessment that the safety profiles of the two

drugs were similar despite these and other differences between the preclinical studies.

[10] The FDA generally considers a safety margin of 25-fold or greater to have no relevance to human safety.  Ex. R ("It has been agreed that if a drug is only positive in rodents at doses above those producing a 25-fold exposure over exposure in humans, such a finding would not be considered likely to reflect a relevant risk to humans."); *see also* Exs. O at 17; N at 2.

[11] Plaintiff also asserts that XenoPort's statements were false or misleading because the tumors in the *Horizant* study were locally invasive and that the no-effect dose for *Horizant* was allegedly half that of gabapentin.  (¶ 28.)  However, Plaintiff does not even attempt to allege the materiality of either allegation.  For all the reasons discussed above, including the fact that the FDA ultimately approved *Horizant*, these allegations also fail.  Moreover, Plaintiff badly distorts the relevance of and record regarding the no-effect dose.  As discussed above, the no-effect dose is relevant to calculate the safety margin for a drug.  The FDA's calculation with regard to *Horizant's* safety margin for the treatment of RLS exceeded the FDA's calculation of gabapentin's safety margin for the treatment of epilepsy in every instance.  Further, following the resubmission of the *Horizant* NDA, the FDA used the 1,000 mg/kg/day no-effect dose for gabapentin to determine that the *Horizant* safety margin was 25.  (Ex. N at 5.)

Cooley LLP
Attorneys At Law
Palo Alto

20.

Defendants' Notice of Motion and Motion
to Dismiss First Amended Complaint
CV-10-3301 RMW

In short, the FAC falls well short of adequately alleging that Dr. Barrett's statement constitutes a material misstatement.

### b. XenoPort Had Not Uncovered Any Issues It Believed Would Affect the NDA

To the extent that Plaintiff also challenges Dr. Barrett's statement in May 2008 "that we have not uncovered any issues that we believe will affect the NDA timing nor the probability of successful NDA approval from the preclinical tox side," the allegations fail for many of the same reasons discussed above. Moreover, the FAC fails to cite to a single contemporaneous document or contain a single particularized allegation that suggests this statement of belief was not genuinely held by Dr. Barrett at the time he made the statement. Indeed, the statement was ultimately validated by the FDA's approval of *Horizant* for RLS in 2011. *See Biovail*, 615 F. Supp. 2d at 231. Moreover, the statement is also inactionable because it was a forward-looking statement protected by the PSLRA's safe harbor provision. 15 U.S.C. § 78u-5(c). Forward-looking statements are protected from securities violations if either (i) they were accompanied by warnings as forward-looking statements or (ii) the speaker did not know of or did not recklessly disregard the statements' falsity. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111-12 (9th Cir. 2010). Statements like Dr. Barrett's regarding the likelihood of FDA approval or a drug's success are quintessential forward-looking statements. *Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*, Case No. 07CV1111-IEG-RBB, 2008 U.S. Dist. LEXIS 38899, at *33 (S.D. Cal. May 12, 2008) ("The statements which simply anticipate success for the [New Drug] Application are clearly forward-looking statements."); *see also In re Dura Pharms., Inc. Sec. Litig.*, 548 F. Supp. 2d 1126, 1142-43 (S.D. Cal. 2008).

Further, the statement was accompanied by the required cautionary language. Before the May 2008 conference call in which the allegedly false statement was made, Defendants cautioned investors that the call would "include forward-looking statements that involve risks and uncertainties, including statements related to . . . future regulatory submissions and the timing thereof" and instructed participants to "refer to the Risk Factors section of [XenoPort's] most recent SEC filings" to obtain "detailed information about the risks and uncertainties that could

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

21.

**DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW**

cause actual results to differ materially from those implied by or anticipated in these forward-looking statements."  (Ex. C at 1.)  In its Form10-Q filed the same day, XenoPort explicitly warned investors that XenoPort might not obtain regulatory approval for *Horizant*.   No reasonable investor could have missed the point:

> The FDA has substantial discretion in the approval process and may refuse to accept any application or decide that our or our collaborative partners' data is insufficient for approval and require additional preclinical, clinical or other studies. For example, **varying interpretations of the data obtained from preclinical and clinical testing could delay, limit or prevent regulatory approval of any of our product candidates**.

(Ex. S at 20 (emphasis added).)

Accordingly, the statement is protected under the PSLRA's safe harbor provisions and cannot support Plaintiff's securities fraud claims.  *Cutera*, 610 F.3d at 1111-12; *see also Biovail*, 615 F. Supp. 2d at 231-32.

### c.    Plaintiff Also Fails To Adequately Allege The Omission Of A Material Statement

The FAC also asserts that XenoPort fraudulently omitted information regarding female rat carcinogenicity in its March 2009 press release announcing the filing of the NDA (¶ 32) and its July 2009 prospectus issued in connection with a secondary offering (¶ 34).  For an omission to be actionable, the "plaintiff must plead 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care.'"  *Zucco*, 552 F.3d at 991 (citation omitted).  The omission of a fact will render a statement materially misleading only where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotations and citation omitted).  These omission allegations fail for essentially the same reasons that the allegations of an affirmative misrepresentation fail.

First, the Company had previously disclosed in May 2008 that the preclinical safety packages for *Horizant* and gabapentin were similar.  For the reasons stated above, this statement accurately described the preclinical studies for *Horizant*.  Indeed, the FDA acknowledged as

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

22.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

1    much in 2010.  Further, the tumors in female rats did not impact either the timing or approval of

2    the NDA; rather, it was cancer in *male* rats that initially concerned the FDA and resulted in the

3    issuance of the CRL.  (Ex. L.)  In fact, the FDA calculated the safety margin for female rats at 28

4    times, well in excess of the 25-fold baseline for relevance in humans.  (Exs. N at 4; R at n.11.)

5    Without relevance to human safety, the tumors in female rats were not likely to affect the NDA,

6    and therefore would not have significantly altered the total mix of information regarding the

7    *Horizant* NDA.  *Biovail*, 615 F. Supp. 2d at 231 (finding information not material where it is not

8    likely to affect NDA timing or approval); *In re PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d 106, 120

9    (D. Mass. 1999) (holding undisclosed fact immaterial where fact "might interest a medical

10   researcher, but would not be an influential factor in making an investment decision").

11        Second, the FAC contains absolutely no allegations suggesting that the FDA ever raised

12   concerns with XenoPort or anyone else prior to the CRL regarding the female rat signal.  Further,

13   in the fourteen months between the CRL and the FDA's approval of *Horizant*, the carcinogenicity

14   results in female rats remained the same, and the FDA neither requested nor did XenoPort

15   provide any additional studies focused on female rats.  Because there was no indication that the

16   carcinogenicity results for female rats would affect the NDA – and in fact did not affect the NDA

17   – that information would not have significantly altered the total mix of information.  It was,

18   therefore, immaterial.  *See Biovail*, 615 F. Supp. 2d at 231.[12]

19        And third, the FDA approved *Horizant*.

20           **3.**     **Plaintiff Fails To Adequately Plead Loss Causation Because The Stock**

21                 **Dropped Before The Alleged Corrective Disclosure**

22        The FAC should be dismissed for another independent reason: Plaintiff fails to adequately

---

[12] Plaintiff also alleges that the CRL "distinguishes between the safety profiles of gabapentin and Horizant in male versus female rats" and the Approval Letter "makes similar distinctions."  (¶ 53.) These statements are simply unsupported by the letters, which Plaintiff conspicuously fails to quote. The Approval Letter mentions nothing about the carcinogenicity tests at all, let alone make distinctions between male and female rats.  With regard to the carcinogenicity tests, the CRL explicitly states that "similar findings were known at the time of our approval of gabapentin, a closely related drug." (Ex. L at 2.)  In fact, the only distinction made by the FDA between male and female rat results in the CRL is that they have different safety margins, and that the "8-fold margin . . . based on the finding of pancreatic carcinoma in the *male* rat, is unacceptably low." (*Id.*)  Thus, the CRL demonstrates that it was cancer in male rats that concerned the FDA, and  that cancer in female rats was immaterial.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

23.

**DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW**

1   plead that the information regarding female rats caused the drop in XenoPort's stock price.  To

2   plead loss causation, a complaint must plead "a causal connection between the material

3   misrepresentation and the loss." *Dura*, 544 U.S. at 342.  "[A]n inflated purchase price will not

4   itself constitute or proximately cause the relevant economic loss."  *Id*.  Rather, a "substantial

5   cause" of the loss must result from investors learning the truth regarding the allegedly

6   misrepresented facts, *In re Daou Systems, Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005), and not from

7   confounding factors, such as "firm-specific facts, conditions, or other events, which taken

8   separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 343.  That

9   is, "[t]o establish loss causation Plaintiff must show that the stock price dropped *after* the truth

10  was 'revealed.'"  *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1040-41 (N.D.

11  Cal. 2007) (emphasis added); *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d

12  1049, 1072 n.9 (9th Cir. 2008) ("[L]oss causation cannot be alleged by referring to a drop in a

13  stock price that occurs prior to the revelation of the alleged truth.").  XenoPort's stock dropped

14  *before* the February 18 conference call in which the carcinogenicity results in female rats were

15  first discussed.  Thus, Plaintiff cannot adequately plead loss causation.

16      XenoPort announced that it had received the CRL after the market closed on February 17,

17  2010.  By 8:15 a.m. EST the next morning – before the conference call that mentioned "for the

18  first time" that tumors appeared in female rats (¶ 61) – XenoPort's stock had already declined 65

19  percent (from $19.60 to $6.86) in pre-market trading.  (Ex. Q.)  Indeed, XenoPort's stock reached

20  as low as $6.50 before the call that morning.  (Ex. P.)  Thus, the entire drop in stock price

21  occurred before any alleged corrective disclosure revealing the "truth" about the carcinogenicity

22  results in female rats.  As a result, Plaintiff's loss causation claims are legally untenable.[13]  The

23  market reacted not to the information about female rats, but to the previous day's press release

24  announcing receipt of the CRL.  Thus, XenoPort's stock price drop "was caused by the agency's

25  failure to approve the drug—not by any 'corrective' disclosure of some prior untruth."  *Biovail*,

26  615 F. Supp. 2d at 229 (dismissing complaint for failing to plead loss causation).

---

[13] Plaintiff makes no attempt to connect the stock drop to the alleged omission of the invasiveness of tumors in the Horizant carcinogenicity study or the study's no-effect dose.  As such, Plaintiff fails to adequately allege violations of Section 10(b) and Rule 10-5 as to these alleged omissions.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

24.

DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.   Plaintiff Fails To State A Claim For Violation Of Section 20**

To establish "control person" liability pursuant to Section 20(a) of the Exchange Act, Plaintiff must show a primary violation of Section 10(b) and that each defendant "directly or indirectly" controlled the violator.  *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996)  Plaintiff's failure to plead a primary violation of Section 10(b) requires the dismissal of this claim.  Further, even assuming a primary violation, Plaintiff has not pled facts sufficient to establish control person liability.  *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987), *overruled on other grounds by Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990).

**C.   The FAC Should Be Dismissed With Prejudice**

"Leave to amend need not be granted when an amendment would be futile."  *Vantive Corp.*, 283 F.3d at 1097 (citation omitted).  Futility of amendment may be shown by a plaintiff's failure to plead additional facts when given the opportunity.  *See Vantive Corp.*,  283 F.3d at 1098.  It has been a year since the first complaint was filed in this action, and nine months since Plaintiff was appointed lead Plaintiff.  Plaintiff has now filed three complaints, and the FAC presumably reflects Plaintiff's best efforts to plead a cognizable claim.  The FAC fails meet the requirements of the PSLRA, and Plaintiffs will be unable to remedy the FAC's deficiencies.  As such, the FAC should be dismissed with prejudice.

**V.   CONCLUSION**

The FAC falls well short of the requirements for pleading fraud under federal securities laws.  Any amendment would be futile and the FAC should be dismissed with prejudice.

Dated: July 29, 2011                           COOLEY LLP

                                                       _____/s/_____
                                                       John C. Dwyer (136533)
                                                       Attorneys for Defendants
                                                       XENOPORT, INC., RONALD W. BARRETT,
                                                       WILLIAM J. RIEFLIN, DAVID A. STAMLER,
                                                       and DAVID R. SAVELLO

951857 v/HN

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

**DEFENDANTS' NOTICE OF MOTION AND MOTION
TO DISMISS FIRST AMENDED COMPLAINT
CV-10-3301 RMW**